## UNITED STATES BANKRUPTCY COURT

## WESTERN DISTRICT OF WISCONSIN

---------------------------------------------------------------------------------------------------

In re:                                                    Case Number:  06-11697-7

      DARYL DeCORA,

           Debtor.

----------------------------------------------------------------

      PETER F. HERRELL, TRUSTEE,

           Plaintiff,

v.                                                        Adversary Number: 07-111

      DARYL DeCORA and HO-CAK FEDERAL,

           Defendants.

---------------------------------------------------------------------------------------------------

### MEMORANDUM OPINION, FINDINGS OF FACT, AND CONCLUSIONS OF LAW

      Musician and satirist Frank Zappa once quipped that "Communism doesn't work because people like to own stuff."  Whether this is an accurate take on geopolitical realities or not, the concept of personal property rights is certainly deeply ingrained into American culture and jurisprudence.  In America, people may own all the stuff they can afford, and they can sell or give their stuff to someone else.  Even when life doesn't take Visa (or some other unsecured form of credit), people find ways to use their stuff as collateral for loans so that they can run out

and buy more stuff.[1]  The present case involves competing interests in an intangible bit of stuff that this Court has encountered before -- namely, a debtor's right to receive tribal per capita distributions from tribal gaming revenues.  The debtor used his right to future distributions as collateral for a loan so that he could afford, among other things, a new car.  The question is whether the creditor took sufficient steps to protect its security interest from challenge.

For the uninitiated, Indian tribes which operate casinos and other gaming operations on tribal lands are permitted under federal law to use a portion of their gambling revenues to fund so-called "per capita" distributions.  These distributions are typically made on a quarterly basis by the tribe to all eligible tribal members.  In In re Kedrowski, 284 B.R. 439 (Bankr. W.D. Wis. 2002), this Court concluded that the right to receive such payments constituted a property right and was property of the bankruptcy estate under 11 U.S.C. § 541(a).  The trustee contends that the defendant's security interest in the debtor's right to receive per capita payments is unperfected and may be avoided under § 544(a) of the bankruptcy code.  The parties have stipulated to the relevant facts and submitted the matter to the Court for determination.

The appropriate starting point for discussion is Kedrowski.  That decision examined the nature of the right to receive per capita payments in extensive detail, which the Court will only summarize briefly here.  First, the Court noted the broad,

---

[1]  As comedian George Carlin's famous monologue points out, "That's what your house is, a place to keep your stuff while you go out and get . . . more stuff!" According to the Federal Reserve, in 2007 Americans' outstanding consumer debt (debt not secured by real estate) was around $2.5 trillion, or roughly $8,200 for every man, woman, and child in the United States.  That'll buy a lot of stuff.

sweeping definition of "property of the estate" found in 11 U.S.C. § 541(a), which includes "all legal or equitable interests of the debtor in property." Second, a debtor's property rights are determined by reference to state law, and under Wisconsin law intangible property is described as "such property as has no intrinsic and marketable value, but is merely the representative or evidence of value." See Grochowski v. Larson (In re Estate of Larson), 196 Wis. 2d 231, 235, 538 N.W.2d 802 (Wis. Ct. App. 1995); see also Wis. Stat. § 409.102(1)(kg) (definition of "general intangible"). Third, the tribal courts of the Ho-Chunk Nation have themselves indicated that tribal members have a right to per capita distributions, if and when they are made, as long as that member is on the rolls of the Ho-Chunk Nation. See Kedrowski, 284 B.R. at 448-49; Hendrickson v. HCN Enrollment, CV 99-10 (Ho-Chunk Nation Trial Court 1999). Finding that tribal per capita distributions were more "conceptually akin" to an interest in a business enterprise than a gift, license, or some form of public assistance, the Court concluded that the right to receive such distributions was an intangible property right under Wisconsin law and thus a legal or equitable interest in property within the meaning of § 541(a). 284 B.R. at 451-52.

Kedrowski specifically focused on the debtor's property right as part of the bankruptcy estate, and dealt only with the trustee's ability to pursue collection of per capita distributions *against the debtor*. Left unanswered were any issues of tribal immunity which might arise if the trustee sought to collect a debtor's distribution directly from the tribe, or any questions regarding the possible assignment or alienation of the debtor's per capita distribution. With this

3

background, the Court now turns to the present case. The parties acknowledge that the debtor is a duly-enrolled member of the Ho-Chunk Nation, and his bankruptcy schedules indicate that he is entitled to receive quarterly per capita distributions from the tribe of approximately $3,000.00 each. After the trustee requested that the clerk's office issue a claims notice, Ho-Cak Federal, now known as Ho-Chunk Federal Bank, filed two proofs of claim. The first proof of claim, in the amount of $18,004.67, was asserted as a secured claim, with the collateral described as an "04 Pontiac G AM" and the "per cap." The second proof of claim was filed in the amount of $3,593.08, and was again characterized as being secured by the "per cap."

The debtor signed two separate security agreements in favor of the bank, and the bank provided the trustee with a copy of a document entitled an "irrevocable partial assignment of right to payments (default)" which was executed by the debtor. This assignment provides that in the event of a default, the bank is entitled to receive payment from any tribal per capita distributions made to the debtor. The bank acknowledges that this document was not filed with the Wisconsin Department of Financial Institutions but was instead sent to the Ho-Chunk Nation. The creditor has received a total of $9,984.16 in tribal per capita payments since this case was filed.[2] The issue before the Court is whether the trustee may avoid the assignment and security interest and compel the turnover of the post-petition funds.

---

[2] A portion of the money was paid to the bank by the tribe on the same day this case was filed. In its brief, for purposes of this case the bank has agreed to consider this a post-petition transfer.

The trustee's contention is that the creditor's security interest in the per capita distributions is unperfected.  Under 11 U.S.C. § 544(a), the trustee may act as a hypothetical lien creditor and avoid security interests which are unperfected under applicable law.  See In re Vitreous Steel Products Co., 911 F.2d 1223, 1233 (7th Cir. 1990) (an unperfected security interest is subordinate to the rights of a later lien creditor, including the bankruptcy trustee); see also Malloy v. Wilserv Credit Union (In re Harper), No. 07-5016, 2008 WL 192862, at *1 (10th Cir. 2008).  By law, the trustee is given the best possible hand, and can defeat any holder of an unperfected security interest.  Only holders of perfected security interests are superior to the trustee.  See In re Scheierl, 176 B.R. 498 (Bankr. D. Minn. 1995); Schieffler v. First Nat'l Bank (In re Peeler), 145 B.R. 973 (Bankr. E.D. Ark. 1992); In re Southern Properties, Inc., 44 B.R. 838 (Bankr. E.D. Va. 1984).

In support of his position that the bank's security interest is unperfected, the trustee cites Johnson v. Cottonport Bank, 259 B.R. 125 (W.D. La. 2000).  In that case, a bank sought to continue collection of a tribal member's per capita distributions.  The debtor contended that 11 U.S.C. § 552 voided the creditor's lien in property acquired after the petition date.[3]  The court found that when a debtor grants a security interest in the right to receive "a stream of future payments," the security interest continues post-bankruptcy if the right to receive the payments existed prior to bankruptcy, and the debtor need not do anything after bankruptcy to make them continue.  Id. at 128; see also Towers v. Wu (In re Wu), 173 B.R.

---

[3] The debtor also argued that the right to per capita payments was not a property right.  For reasons similar to those articulated in Kedrowski, the Johnson court disagreed. 259 B.R. at 130-31.

5

411, 413-15 (B.A.P. 9th Cir. 1994) (commissions on post-petition insurance policy renewals were property of estate only to extent that the debtor's post-petition services were not a prerequisite to payment).

The court found that the per capita payments were the proceeds of the right to receive them, a right "obviously transferred" by the assignment.  Even if the payments could not be specifically characterized as proceeds, the court found that "they are still more closely related to and perhaps inseparable from the original collateral," and the creditor's lien attached to the payments received after the petition date.  Id. at 130.  Crucially, however, the Johnson court noted the existence of a condition precedent to the post-petition continuation of such a security interest: the *proper perfection* of the interest itself.  See 259 B.R. at 128 (debtor did not contest validity of lien or offer evidence that lien was not properly perfected under state law); In re Lortz, 344 B.R. 579 (Bankr. C.D. Ill. 2006) (perfection is only significant with respect to the creditor's rights vis-a-vis third parties).

The bank admits that it did not file a financing statement with the Wisconsin Department of Financial Institutions.  The trustee submits that the bank *should* have done so, as the debtor did not completely assign his right to the per capita distributions to the bank but only granted the bank a collateral interest in the tribal distributions in the event he failed to make payments on the loans.  The Wisconsin Uniform Commercial Code applies to a transaction, "regardless of its form," that creates a security interest in personal property.  See Wis. Stat. § 409.109(1)(a); see also Nat'l Operating, L.P. v. Mut. Life Ins. Co., 2001 WI 87, 244 Wis. 2d 839,

630 N.W.2d 116 (2001) (interpreting prior version of Article 9, the Wisconsin Supreme Court noted that it applied to "any transaction that is intended to create a security interest").  The so-called partial irrevocable assignment in this case was clearly intended to create a security interest, and the bank has indicated as much in its proofs of claim and its pleadings in this adversary.

The general rule is that a financing statement must be filed to perfect all security interests, and a security interest in personal property must be filed with the Office of the Department of Financial Institutions.  See Wis. Stat. §§ 409.310 and 409.501(b); Hanley Implement Co. v. Riesterer Equipment, Inc., 150 Wis. 2d 161, 441 N.W.2d 304 (Wis. Ct. App. 1989) (perfection of security interest usually necessary to preserve secured party's rights against third parties).  Under Wisconsin law, an unperfected security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is actually perfected.  See Wis. Stat. § 409.317; Muggli Dental Studio v. Taylor, 142 Wis. 2d 696, 419 N.W.2d 322 (Wis. Ct. App. 1987).  Thus, the trustee's argument is relatively straightforward:  The bank took a security interest and failed to properly perfect it.  As the bankruptcy trustee stands in the position of a hypothetical lien creditor, the bank's interest in the per capita distributions is now subordinate to his interest.

Of course, it takes two to tango, and if the bank did not plan on dancing there would be no reason for this rather lengthy recitation of secured transaction law.  In its defense, the bank offers up two alternate theories, either of which could arguably win the day.  The bank's first turn is to suggest that the bankruptcy estate

7

has no interest in the per capita distribution because under the assignment and the

tribal ordinance regarding claims against per capita distributions, the debtor has no

right to the money.  In essence, if one construes the debtor's property interest as a

right to a stream of payments, the bank contends that the assignment serves as a

dam, diverting the flow until its claims are paid in full, at which point the payments

are restored to their original channel.

While this appears to fly in the face of Wis. Stat. § 409.109(1)(a) and the

notion that *any* transaction which creates a security interest is subject to the terms

of Wisconsin's version of Article 9, the bank directs the Court's attention to the

tribal Claims Against Per Capita Ordinance.  The bank also references a letter

from the tribal attorney, which alleges that the per capita payments remain the

property of the tribe until they are released directly to the tribal member.  According

to the bank, what this means is that when the tribe pays a creditor, the payment

comes out of "funds in which the member has no interest."  Because the debtor

had no right or interest in the funds, he had no right which could pass to a

hypothetical lien creditor or bona fide purchaser; accordingly, no right could pass to

the trustee.  Article 9 is thus bypassed in its entirety.

To which one must ask:  what came first, the chicken or the egg?[4]  How is it

that the bank can get paid from funds which do not belong to the debtor (or to

which he is not entitled), when the only basis for payment is an assignment of the

_____

⁴ Apparently, this is a greater philosophical dilemma than one might initially
assume.  See Wikipedia, "Chicken or the Egg," http://en.wikipedia.org/wiki/
Chicken-and-egg_problem (last accessed on March 12, 2008) ("To ancient philosophers,
the question about the first chicken or egg also evoked the questions of how life and the
universe in general began.").

debtor's right to receive the funds?  To answer this question one need not consult either Aristotle, Plutarch, or Stephen Hawking.[5]  Instead, one must turn to the Ho-Chunk Nation's Claims Against Per Capita Ordinance, which makes up for not being written by an ancient Greek philosopher by being rather instructive about the matter at hand. As the Court recognized in <u>Kedrowski</u>, the Ho-Chunk Nation has no obligation to issue a per capita distribution to tribal members.  By both federal and tribal law, it is an optional, discretionary act on the part of the tribe.[6]  In order to avoid disputes, however, the tribe has also made it clear that no member of the tribe can compel the issuance of a per capita distribution, and the funds to be distributed belong to the tribe until the distribution is made.  For example, the tribal Claims Against Per Capita Ordinance provides that:

> Per Capita Distributions shall be made, when and as determined or declared in accordance with Per Capita Distribution Ordinance and any and all other applicable laws of the Nation, out of assets and earnings of the Nation, and such assets and earnings shall retain their character as property of the Nation until Payment of Per Capita Shares is actually made therefrom.  No Tribal Member, nor any person claiming any right derived from a Tribal Member, including creditors of a Tribal Member, shall be entitled to compel the making of any Per Capita Distribution prior to the time of Payment thereof . . . No Tribal Member, nor any person claiming any right derived from a Tribal Member, including creditors of a Tribal Member, shall have any right, title, interest or entitlements in any Per Capita Share unless and

---

[5] All of whom have addressed the chicken or the egg question.  <u>See</u> Wikipedia entry at note 3, <u>supra</u>.

[6] <u>See</u> the Ho-Chunk Nation Per Capita Distribution Ordinance, 2 HCC § 12.5 (at specified times, the tribal legislature "shall also determine what amount, if any, of the revenues allocated to general welfare purposes shall be appropriated for distribution as per capita payments").  This tribal ordinance should not be confused with the Ho-Chunk Nation *Claims Against* Per Capita Ordinance (emphasis added), which is cited as 2 HCC § 8.  Once the tribe has exercised its discretion to issue a distribution to tribal members, of course, it is obligated make the payments equally in accordance with an approved ordinance.  <u>See</u> <u>Kedrowski</u>, 284 B.R. at 446.

until Payment of Per Capita Distribution to which it relates occurs, and any right, title, interest and/or entitlement accruing at Payment shall be subject to Section 5 hereof.

See 2 HCC § 8.4.[7]

When reading this provision, a well-trained legal observer will note that what appears at first blush to be the random insertion of capital letters actually signifies the use of a hallowed legal drafting technique, the "defined term."  Thus, for example, a "Per Capita Distribution" is defined not by reference to a standardized dictionary but rather by § 8.3(e) of the tribal ordinance.[8]  The existence of defined terms scattered throughout the Claims Against Per Capita Ordinance plays a significant role in understanding the debtor's right to the per capita money under § 8.4 and a creditor's right to claim an interest in that money under § 8.5.  Which, by the way, provides for the enforcement of certain claims against the per capita payments, and states that these claims "shall be recognized and enforced by the Nation against a Per Capita Share at the time of Payment of the Per Capita Distribution of which it is a part and prior to the distribution of such Per Capita Share to a Tribal Member."

Now, the first question is whether all of these provisions really mean, as the bank appears to suggest, that a tribal member's right to the per capita money

---

[7] The section also provides that "making each Per Capita Distribution, and the amount and timing thereof, shall at all times prior to Payment be subject to elimination or modification pursuant to any amendment to the then effective Per Capita Distribution Ordinance adopted in accordance with the Constitution and laws of the Nation."

[8]  Which defines it as "a distribution made by the Nation to its Members on an equal per capita basis pursuant to its Per Capita Distribution Ordinance then in effect, and in accordance with Section 11(b)(3) of the Indian Gaming Regulatory Act, 25 U.S.C. Sec. 2710(b)(3), or any other successor statute, or any other distribution of Tribal assets or earnings on a per capita basis to Members."

doesn't exist until the tribe places the money in the member's hand (or mailbox).[9]

The second question is whether the Nation's acknowledgment of the bank's claim

has the actual effect of so completely diverting the right to the money from the

debtor to the bank that it is fair to say that the debtor never had any right to those

particular distributions.  In order to answer these questions, one must read the

tribal ordinances in concert with the definitions found in § 8.3, not only of a Per

Capita Distribution[10] but also of a Per Capita Share[11] and Payment of a Per Capita

Share.[12]

The provisions of § 8.4 can be parsed as follows.  First of all, the tribe can

distribute money on an equal per capita basis to tribal members in accordance with

the tribal per capita ordinance.[13]  Second, until the checks are cut and some of

---

[9] The bank has not asked the Court to reconsider Kedrowski.  Indeed, both the bank's belief that the debtor's right to per capita payments can serve as collateral and the Nation's willingness to recognize at least certain claims would appear to support the finding that the debtor has a "legal or equitable interest" in receiving future per capita payments.  Borrowing from the stream of payments analogy once more, it appears that the bank agrees that the debtor has a property right in the creek itself, but contends that he divested himself of the right to a portion of the current within the creek.

[10] See note 7, supra.

[11] This is defined as "each Member's equal pro rata share of a Per Capita Distribution, without reduction for any withholding, garnishment, or levy permitted by this Ordinance, but after withholding at the source required by federal income tax law."  2 HCC § 8.3(f).

[12] Defined in the ordinance as "the time at which preparation of checks and all preparatory activity concerning a Per Capita Distribution is complete and checks for some of [sic] all Per Capita Shares, other than those which may be affected by claims hereunder, are placed in the U.S. Mail or delivered to another independent delivery service."

[13] See definition of "Per Capita Distribution," supra note 7, and the beginning of the first sentence of § 8.4 ("Per Capita Distributions shall be made, when and as determined or declared in accordance with Per Capita Distribution Ordinance and any and all other applicable laws of the Nation").

them are dropped in the mail, the money still belongs to the tribe.[14]  No tribal

member or creditor of a tribal member can compel an individual distribution *until* at

least some of the checks are in the mail.[15]   No one other than the tribe has any

right to the money until that point (i.e., the moment an undefined number of checks

are in the mail), and the Nation will hold back the checks for any tribal member

whose right to payment is subject to the claims outlined in § 8.5.[16]  The bank's

argument is centered on this final concept: that any right to payment is "subject" to

payment of the claims outlined in § 8.5 (which would include payment of the bank's

claim).

In law school, students are often taught about conditions precedent and

conditions subsequent.  A condition precedent is an act or event which must exist

or occur before a duty or obligation arises; a condition subsequent is an event

which, if it occurs, will bring something to an end.  See Black's Law Dictionary 312

(8th ed. 2004).  With the former, a party is under no obligation until the condition

arises; with the latter, the obligation *exists* until the condition arises.  Rights and

---

[14] See definition of "Payment of a Per Capita Share," supra note 11, and the final clause of the first sentence of § 8.4 ("such assets and earnings shall retain their character as property of the Nation until Payment of Per Capita Shares is actually made therefrom").

[15] See definition of "Payment of a Per Capita Share," supra note 11, and the second sentence of § 8.4 ("No Tribal Member, nor any person claiming any right derived from a Tribal Member, including creditors of a Tribal Member, shall be entitled to compel the making of any Per Capita Distribution prior to the time of Payment thereof").

[16] See definition of "Payment of Per Capita Share," supra note 11, and the final sentence of § 8.4 ("No Tribal Member, nor any person claiming any right derived from a Tribal Member, including creditors of a Tribal Member, shall have any right, title, interest, or entitlements in any Per Capita Share unless and until Payment of Per Capita Distribution to which it relates occurs, and any right, title, interest and/or entitlement accruing at Payment shall be subject to Section 5 hereof").

interests in property may also be subject to similar restrictions in that a party might

only be entitled to something under certain circumstances (a condition precedent

to receipt of the property) or might actually lose the right to the property because of

some event or occurrence (the arising, if you will, of a condition subsequent).  This

discussion is important to the present inquiry only in that the text of § 8.4 provides

that the right of a tribal member to a per capita share is "subject to" payment of

claims under § 8.5.

Far from being a payment out of funds in which the member has no interest,

the tribal ordinance reflects that payments to creditors are made from money which

tribal members would otherwise be entitled to receive.  The members are entitled

to the money; it is simply that their right to the money is "subject to" the claims of

certain creditors.  Conceptually, the stream of payments still flows from the Nation

to the tribal member, and only *then* is it diverted to the creditor.  Section 8.4 makes

this clear by continually referencing that the creditor's rights are "derived from a

Tribal Member."  Further, a tribal member's per capita share is calculated "without

reduction for any withholding, garnishment or levy permitted by this Ordinance,"

which again indicates that the tribal member's right to the money arises before it

becomes "subject to" the creditor's claim.

The bank suggests that § 8.5(a) supports its interpretation of the ordinance,

in that it provides the claims will be enforced "against a Per Capita Share at the

time of Payment of the Per Capita Distribution of which it is a part and prior to the

distribution of such Per Capita Share to a Tribal Member."  Consulting the

definitions found in the ordinance, however, leads to a contrary conclusion.[17]  The

ordinance simply provides that at the time a tribal member becomes entitled to the

per capita money,[18] the tribe will enforce certain claims against the money before

distributing it (in a lower case sense) to the member.  In this regard, § 8.6 of the

ordinance states that the Nation will pay the "full amount of the Per Capita Share,

less any claim recognized under Section 5," to the tribal member.  Even the bank's

assignment documents state that the debtor authorized payment of the bank's

claim "from the per capita distribution *made by the Ho-Chunk Nation to me*"

[emphasis added].  Given all of this, the debtor's right to the stream of payments is

unaffected, and the right to each distribution accrues to the debtor before the

money itself is subsequently diverted to the payment of any § 5 claims.  Put simply,

the tribe paid the debtor's money to the bank.[19]  In a contest against a hypothetical

lien creditor or a bankruptcy trustee, the bank is only entitled to keep the money if it

properly perfected its security interest.

---

[17]  Incorporating the meaning of the defined terms, the section would read something like this: The Nation will enforce the referenced claims "against [a tribal member's equal pro rata share of a Per Capita Distribution] at the time [at which preparation of checks and all preparatory activity concerning a Per Capita Distribution is complete and checks for some of [sic] all Per Capita Shares . . . are placed in the U.S. Mail] of a [distribution made by the Nation to its Members on an equal per capita basis] of which it is a part and prior to the distribution of such [Member's equal pro rata share of a Per Capita Distribution] to a Tribal Member." Or, roughly translated: The Nation will pay claims asserted against a tribal member's money after some of the checks from a per capita distribution have been mailed, but before sending a check to the member.

[18] As indicated previously, the definition of "Payment of Per Capita Share" and § 8.4 provide that the tribal member's right to the money arises once some of the per capita checks have been mailed (and excluding those which have been held back subject to § 8.5).

[19]  One must ask: why else would the Nation pay the bank?  Certainly the tribe has no incentive to give its own money to the creditors of tribal members.  Instead, it appropriates the member's money for the payment of certain obligations.

14

Section 8.5 of the tribal Claims Against Per Capita Ordinance indicates that the tribe will not recognize any claim, garnishment, levy, attachment, assignment, or other legal right or interest other than as specified in the ordinance itself. Pursuant to the ordinance, a member's per capita share may be redirected to pay debts owed to the tribe, child support debts, federal income tax levies, debts to Ho-Cak Federal, and debts owed to tribal elders. The bank argues that even if the debtor's right to the money passed to the bankruptcy trustee, it properly "perfected" its security interest under this section. This argument can be summed up like this: The Nation will recognize (and pay) Ho-Cak Federal's claim, while it refuses to recognize or enforce other claims arising from commercial debts or liability. See U.W. Stevens Point v. Orbert S. Goodbear (Ho-Chunk Nation Trial Court 1998), slip op. at p. 2 ("The Court remains without statutory authority to order the attachment or garnishment of a tribal member's per capita distributions based on commercial debt or liability"). Section 8.5(a)(4) of the tribal ordinance indicates that the debt must be in writing, be signed by the tribal member, and indicate on its face that the member agrees to allow payment to be made from per capita distributions. Since the bank's assignment satisfies these requirements, and it sent a copy of the documents to the tribe, the bank believes nothing else needed to be done for it to get paid from the "per cap" if the debtor defaulted. This, suggests the bank, is perfection.

The principal problem with this argument, however, is that the tribe's Claims Against Per Capita Ordinance is not a vehicle for the perfection of claims or interests; it is an assertion of the tribe's sovereign immunity. As provided in Article

III, Section 1 of the Constitution of the Ho-Chunk Nation, the tribe "possesses

inherent sovereign powers by virtue of self-government and democracy."  Similarly,

Article XII, Section 1, provides that the Nation "shall be immune from suit except to

the extent that the Legislature expressly waives its sovereign immunity."  The

Nation guards its sovereign immunity carefully.  See Ho-Chunk Nation Dep't of

Housing and Scholze Ace Home Ctr., Inc., v. Edward Perry d/b/a Perry Constr.

(Ho-Chunk Nation Trial Court 2001), slip op. at 29 (the Ho-Chunk Nation has not

expressly waived its sovereign immunity).

As this Court noted in Kedrowski, throughout its per capita ordinances the

Ho-Chunk Nation is careful to protect its right *not* to issue a per capita distribution if

the tribe elects not to do so (i.e., the tribe repeatedly stresses that no one can

compel the tribe to issue a per capita distribution).  In addition, the tribe specifically

rejects any suggestion that it might have an obligation to pay the creditors of a

tribal member, except under certain narrow circumstances.  It does this by refusing

to "recognize or enforce" any claims other than those specifically referenced in the

ordinance.  Since the Nation has not waived its sovereign immunity, it can get

away with this in most instances because it is otherwise immune from suit.

Precisely how that immunity benefits the bank is open to debate.  A review

of § 8.5 of the ordinance does not indicate precisely how the bank might perfect its

interest (for example, by filing a copy of the security documents with a particular

office, or by some other notice).  Notably, in § 8.5(b) it provides that if multiple

claims are "made" against the same per capita share, the order of payment shall

be as follows: federal tax levies; child support; debts to the Nation; and debts to

16

Ho-Cak Federal.  It doesn't appear to matter whether the bank's assignment was sent to the tribe prior to a tax levy or a child support claim; those claims would still be paid before the bank's debt.  In contrast to Article 9, the tribal ordinance plays favorites and regards the nature of the claim as more important than the order of any "perfection."  Further, the section goes on to provide that "nothing in this Ordinance shall restrict the Nation from obtaining security for and enforcing the debts of Tribal Members to the Nation through mortgages, liens, foreclosures, attachments, and other remedies," all of which hardly suggests that the ordinance is designed to operate quite as the bank proposes.  It is not crafted to establish the rights of competing creditors, but rather to protect the tribe and control the distribution of per capita payments through an exercise of its sovereign immunity.

The ordinance itself reflects what would happen if a federal tax levy were to be served upon the tribe after the bank's assignment had been "filed."  Under the ordinance, a subsequent tax levy would apparently prime the bank's claim.  But another possible situation more fully illustrates the problem of regarding the tribal ordinance as a system of perfecting security interests, which is that it does not address priority over lien creditors in the absence of sovereign immunity.  Tribal sovereign immunity is not absolute, and it can be waived by Congress.  Santa Clara Pueblo v. Martinez, 436 U.S. 49, 58, 98 S. Ct. 1670, 56 L. Ed. 2d 106 (1978); Krystal Energy Co. v. Navajo Nation, 357 F.3d 1055, 1056 (9th Cir. 2004); Russell v. Fort McDowell Yavapai Nation (In re Russell), 293 B.R. 34 (Bankr. D. Ariz. 2003).  Under a number of statutes, Congress has opted to abrogate tribal

immunity.[20]  One such statute is the Federal Debt Collection Procedure Act.  In

United States v. Lambert, No. 2:05CR214, 2007 WL 4118380, at *1 (W.D. N.C.),

the court found that the FDCPA unequivocally waived tribal immunity, and that a

tribe was required to honor a governmental garnishment of a tribal member's per

capita distribution.  The court observed that "the Tribe, as Garnishee, must pay

over to the federal government any property in which the Defendant has a

nonexempt interest.  That property includes a per capita distribution to tribal

members of gaming revenues."  Id.

It is not necessary to decide whether the FDCPA actually waives tribal

immunity, because the tribe itself recognizes that Congress has the power to

abrogate tribal immunity should it choose to do so.  See Perry, slip op. at 24-25.

The important point to note is that the tribal ordinance offers the bank no protection

should such a situation arise.  The ordinance does not establish a system of

priority between claimants based on the perfection of their claim; it contains no

provision for the notion of "first in time, first in right."  The type of governmental

claim at issue in Lambert was that of a lien creditor, which under Article 9 would fall

---

[20]  There is some authority for the suggestion that 11 U.S.C. § 106(a), which
provides for the abrogation of sovereign immunity for a variety of governmental units,
including "other foreign or domestic governments," might abrogate tribal sovereign
immunity in bankruptcy proceedings.  See Krystal Energy, 357 F.3d at 1057 ("Indian tribes
are certainly governments, whether considered foreign or domestic (and, logically, there is
no other form of government outside the foreign/domestic dichotomy, unless one
entertains the possibility of extra-terrestrial states)"); Russell, 293 B.R. at 44 ("The term
'other foreign or domestic government' in [the bankruptcy code] unequivocally, and without
implication, includes Indian tribes" as governmental units whose sovereign immunity is
abrogated under § 106(a) of the code).  The Ho-Chunk Nation's tribal courts disagree with
this conclusion.  Perry, slip op. at 28 ("Congress has not unequivocally expressed a waiver
of tribal sovereign immunity from suit by means of 11 U.S.C. Section 106(a)").
Fortunately, for purposes of this decision it is unnecessary to answer this question.

behind a properly perfected security interest.  What portion of the tribal ordinance

would the bank reference in an attempt to argue that its claim was superior to such

a garnishment, once the aura of tribal immunity had vanished?  The tribal

ordinance does not mention the word "perfection," nor does it address the legal

effect of lien notation and the consequences of perfection (namely, priority).  Quite

simply, it is not a system of lien perfection.[21]

The Tenth Circuit's recent decision in Malloy v. Wilserv Credit Union (In re

Harper), No. 07-5016, 2008 WL 192862 (10th Cir. 2008) reflects the importance of

priority in a statutory system of lien perfection.  In that case, the debtor purchased

a truck and subsequently refinanced the loan with a credit union.  The Muscogee

(Creek) Nation issued a certificate of title with a notation regarding the credit

union's lien.  When the debtor filed bankruptcy, the trustee sought to avoid the lien

on the grounds that the credit union's lien was not properly perfected because the

certificate of title was not issued by the Oklahoma Tax Commission as required

under Oklahoma law.  While the court noted that Oklahoma's legislature

specifically amended its version of Article 9 to permit perfection of liens by way of

tribal certificates of title, the definition of "certificate of title" contemplated that  lien

---

[21] Speaking of lien creditors, Wis. Stat. § 409.317(1)(b) provides that a security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected.  The tribe's sovereign immunity permits it latitude in refusing to pay other creditors, but the ordinance itself is silent as to *the bank's priority* over lien creditors.  The ordinance does not provide that the bank is entitled to the money over other creditors *because* it "perfected" a security interest.  It just says that the tribe won't pay anyone else.  If it were a system of lien perfection, the ordinance would need to clearly establish the bank's right to the money over the rights of a lien creditor.  As it stands now, once the money leaves the Nation's coffers, the tribe's refusal to recognize other claims does not clearly articulate that the bank has *a greater right* to the money than a lien creditor.

notation must be a condition or result of the security interest's obtaining priority over the rights of a lien creditor with respect to the collateral.  The court found "too little to go on" in an effort to locate a tribal source of establishing perfection and priority, and affirmed the avoidance of the credit union's lien.  2008 WL 192862, at *6.  In contrast, another recent decision found that the Cherokee Nation's certificate of title statutes *did* provide a basis for perfection.  See Malloy v. Cornerstone Bank (In re Snell), 329 B.R. 753 (Bankr. N.D. Okla. 2005).  In Snell, however, the Cherokee statutes clearly provided for the perfection of liens, while the Muscogee (Creek) Nation had "no applicable law concerning the creation and perfection of security interests in vehicles."  Harper, 2008 WL 192862, at *5.

The Ho-Chunk Nation's Claims Against Per Capita Ordinance does not provide for the creation and perfection of security interests in per capita distributions, and does not address questions of priority as against lien creditors, except to the extent that the tribe refuses to pay such claims.  Ho-Cak Federal is not a tribal entity. It is not entitled to rely upon assertions of sovereign immunity, and only assumes that the tribe's immunity from suit inures to its benefit because any other creditor's attempts at garnishment or levy would typically be met by the silence of a sovereign who need not comply.  That may be a form of protection, but it is not perfection within the meaning of secured transactions law.  The debtor in this case is a Wisconsin resident; the creditor is a division of Citizens Community Federal Bank.  Ignoring the red herring of the tribe's sovereign immunity, there is really only one question to ask.  How does a Wisconsin creditor *properly perfect* a security interest in a general intangible owned by a Wisconsin resident?

Chapter 409 of the Wisconsin Statutes governs secured transactions in Wisconsin. Nat'l Operating, 630 N.W.2d at 125. Wis. Stat. § 409.301 provides the general rule that "while a debtor is located in a jurisdiction, the local law of that jurisdiction governs perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." The comments to this section indicate that this rule is applicable to the perfection of security interests in both tangible and intangible property. Consequently, the law of the state of Wisconsin, not the Ho-Chunk Nation, is the appropriate source of law for issues of "perfection, the effect of perfection or nonperfection, and the priority of a security interest in collateral." See also Harper, 2008 WL 192862, at *1 (the local law of the jurisdiction where the debtor is located generally governs perfection and priority of a non-possessory security interest).

Under Wisconsin law perfection is not obtained by sending a copy of a security interest to someone who owes the debtor money, even if that party may be entitled to rely upon sovereign immunity to ignore the claims of other creditors. Instead, perfection of a security interest in intangible property is accomplished by the filing of a financing statement with the Wisconsin Department of Financial Institutions. Wis. Stat. §§ 409.310 and 409.501(b); see also Hanley Implement, 441 N.W.2d at 166. The only way the bank's security interest could be perfected would be if Wisconsin law somehow permitted, or authorized, the tribal ordinance as a substitute form of perfection. Wis. Stat. § 409.311 provides for the perfection of security interests in property subject to certain other statutes, regulations, or treaties, but none of the exceptions in that statute would apply to this case. Given

that no financing statement was filed, the bank's security interest is subordinate to

the claim of a hypothetical lien creditor.  Wis. Stat. § 409.317.

As the dance draws to a close, several points are clear.  The debtor had an

intangible property right to per capita payments which he used as collateral for a

loan from the bank.  The bank took an assignment of his per capita interest as

security for the loan, but did not file a financing statement with the Wisconsin

Department of Financial Institutions as is required under Wisconsin law to perfect

such a security interest.  The tribal per capita ordinances cannot serve as a

substitute for perfection under Wisconsin law.  The bank's security interest is

therefore unperfected and may be avoided by the bankruptcy trustee as a

hypothetical lien creditor under § 544(a).

Accordingly, the bank's security interest is avoided, and the bank is an

unsecured creditor in this bankruptcy estate.  The bank shall turn over all post-

petition payments it has received from the Nation, and shall tender to the trustee

any future payments which it may receive.

This decision shall constitute findings of fact and conclusions of law

pursuant to Bankruptcy Rule 7052 and Rule 52 of the Federal Rules of Civil

Procedure.

Dated:  March 28, 2008

BY THE COURT:

/s/ Thomas S. Utschig

_____

Hon. Thomas S. Utschig
U.S. Bankruptcy Judge